1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

OLOTH INSYXIENGMAY,

               Petitioner,

     v.

RICHARD MORGAN,

               Respondent.

Case No. C00-5500RJB

ORDER ON PETITION
FOR WRIT OF HABEAS
CORPUS

     This matter comes before the court on petitioner's Petition for Writ of Habeas Corpus.  Dkt. 4. The court has considered the relevant documents and the remainder of the file herein, and has conducted an evidentiary hearing.  The court hereby issues the following decision.

PROCEDURAL HISTORY AND CLAIMS

     Petitioner originally filed this petition for writ of habeas corpus on August 31, 2000, challenging his 1995 conviction of two counts of first degree murder and two counts of first degree assault. On February 12, 2002, following proceedings which are no longer relevant to the issues in the case, petitioner filed an Amended Petition for Writ of Habeas Corpus Dkt. 63. The petition raised six claims for relief, which are quoted as follows:

    1.    Did the trial court error in failing to instruct the jury on the lesser included offense of manslaughter.

    2.    Was the petitioner denied the right of cross examination secured by the confrontation clause of the sixth amendment to the united states constitution where statements of a non-testifying co-defendant which implicated him were introduced at trial, after the petitioner had timely and repeatedly moved for severance.

ORDER
Page - 1

3.      Did the trial court abuse its discretion by denying the defense motion to reopen the case to allow petitioner to exercise his constitutional right to testify on his own behalf.

4.      The trial court violated petitioner's constitutional right when it denied the petitioner the right to be present at a critical stage of the proceedings, furthermore the court violated petitioner's right to effective assistance of counsel when the court ordered petitioner's counsel from discussing matters of the proceedings with petitioner.

5.      Was petitioner denied his right to confrontation and due process when the co-defendant's testimony was admitted after he testified to harboring a belief that the state's plea agreement was conditioned both on his testimony and resulting conviction of the petitioner.

6.      Did the trial court violate petitioner's sixth amendment right to confrontation when it excluded evidence that Southanom Missengsay had lied during a polygraph examination because the evidence was highly relevant to show that Missengsay had a motive to lie in order to preserve juvenile court jurisdiction for himself and there was no compelling state interest to exclude such evidence.

Dkt. 64, at i.

On August 30, 2002, the Magistrate Judge recommended that petitioner's amended petition be dismissed, concluding that Claims 1, 2 and 6 were procedurally barred and that Claims 3,4, and 5 did not warrant habeas relief. Dkt. 49. The court adopted the Report and Recommendation on September 25, 2002. Dkt. 52.

Petitioner appealed, and the Ninth Circuit Court of Appeals granted a Certificate of Appealability on the following issues: (1) whether the district court erred by dismissing the petition as procedurally barred, including the question whether the bar at issue has been consistently applied; and (2) whether petitioner's constitutional rights were violated by the exclusion of petitioner and his attorney from an in camera hearing before the state trial court.  *See* Dkt. 58.   Claims 3 and 5, which had been dismissed on the merits by the district court, are no longer at issue, since the Ninth Circuit granted a Certificate of Appealability on only the claims found to be procedurally barred by the district court (1, 2, and 6) and Claim 4.

On March 30, 2005, the Ninth Circuit remanded the case, concluding that Claims 1, 2, and 6, the three claims that had been dismissed as procedurally barred, had been exhausted in state court and should therefore be resolved on the merits; and that petitioner is entitled to an evidentiary hearing on Claim 4. *Insyxiengmay v. Morgan*, 403 F.3d 657 (9th Cir. 2005).

1    The claims that are before the court for resolution on the merits are Claims 1, 2, 4, and 6.  On

2  January 5, 2006, the court held an evidentiary hearing on Claim 4.  The court has received briefing from

3  the parties on all of the claims.  The court has read and considered the entire record submitted in this case.

4                                        RELEVANT FACTS

5    The Washington Court of Appeals summarized the facts of the case, in petitioner and his co-

6  defendant Nga Ngeoung's direct appeal, as follows:

7         On August 25, 1994, four high school boys drove down a Tacoma street throwing eggs at
      houses.  One or two of the eggs were thrown at a house on 168th Street East, which turned out to
8      be a hang out for local gang members.  As the boys drove away form the house and toward their
      home, they noticed that they were being followed.  The car in pursuit had its high beams on and
9      was following closely.  The boys tried to evade the pursuers, but the car kept up.

10        The boys heard gunfire and ducked down in their seats.  A second shot shattered the car
      window.  More shots were fired and the driver was hit.  The boys' car drifted up an embankment
11      and came to a stop.  The other three boys ran from the car to local houses.  One of the three fell on
      the ground on the way, mortally wounded.  The remaining two boys reached help, but their two
12      friends died before an ambulance arrived.

13        The subsequent investigation identified the three occupants of the pursuing car: Oloth
      Insyxiengmay, aka "Tiny Snoopy" (hereinafter Oloth), Nga Ngoeung, aka "Shamrock" (hereinafter
14      Nga), [Footnote 1: We refer to the defendants by their first names for our convenience and with the
      consent of appellate counsel.] and Sutthanom Misaengsay, aka "Candyman" (hereinafter
15      Sutthanom).  All three were under 18 years of age.  Oloth, Nga and Sutthanom were outside the
      house on 168th Street East when it was egged.  When he saw the egging, Oloth ran into the house
16      and returned with a rifle.  Oloth opened the car door for Sutthanom and told him to get in.  Nga
      took the driver's seat.  Then the three drove off after the boys.  According to Sutthanom, it was
17      Oloth who put the rifle out the window and fired at the boys' car.

18        The three returned to the gang house and Oloth gave the rifle to one of its occupants to
      dispose of.  Oloth said, "We shot them up.  We shot them up.  They threw eggs at us, the Rickets.
19      We shot them up."

20        Oloth was arrested on September 1, 1994.  After being advised of his rights, he agreed to
      make a statement.  Oloth admitted to being in the car during the shooting but denied being the
21      shooter, naming instead a fourth person, known as "Sin Dog."

22        Nga was arrested on September 3, 1994.  He also agreed to waive his rights and speak to
      the police.  Nga confessed to driving the car and identified the shooter as "Choun."  Subsequently,
23      Nga admitted there was no such person.

24        Sutthanom was the last to be arrested.  He also initially identified a fourth person as the
      shooter.  But later Sutthanom identified Oloth as the shooter and entered into a plea agreement
25      with the State, agreeing to testify and plead guilty in return for the State's promising not to charge
      him as an adult.

26

27

28

1    Oloth and Nga were eventually tried as adults. Oloth was convicted of two counts of first
     degree murder, based upon the element of extreme indifference to human life, and two counts of
2    first degree assault. Nga was convicted of two counts of aggravated first degree murder and two
     counts of first degree assault. [Footnote 2: Nga was also convicted of taking a motor vehicle
3    without the owner's permission, but has not contested that conviction.]

4    *State v. Insyxiengmay*, 93 Wn.App. 1030 (1998); Dkt. 44, Exh. 2.

5    The Washington Supreme Court later denied review of a Washington Court of Appeals decision

6    that had dismissed petitioner's personal restraint petition. Dkt. 72, Exh. B. In its April 11, 2001 Ruling

7    Denying Review, the Washington Supreme Court set forth the facts as follows:

8    A Pierce County jury found Mr. Insyxiengmay guilty of two counts of first-degree murder
     and two counts of first-degree assault. The crimes stemmed from an incident which began when
9    four high school boys drove down a Tacoma street throwing eggs at houses and cars. One of the
     houses they struck was a hangout for members of a local gang. Mr. Insyxiengmay, then 15 years
10   old, was outside the house at the time. When the eggs struck, he went inside and retrieved a rifle,
     and he and some friends, with Nga Ngoeung driving, pursued the egg throwers in a car. When they
11   caught up, someone in the car fired several shots, killing one of the boys instantly and mortally
     wounding another. Mr. Insyxiengmay and Mr. Ngoeung were tried together and both were found
12   guilty of two counts of first-degree murder and two counts of first-degree assault. On the murder
     counts, however, Mr. Ngoeung was convicted of premeditated first-degree murder and Mr.
13   Insyxiengmay of first-degree murder based on grave indifference to human life.

14   Dkt. 72, Exh. B, at 1-2.

15   <u>LEGAL STANDARD</u>

16   A habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in

17   the state courts unless the adjudication either  (1) resulted in a decision that was contrary to, or involved an

18   unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2)

19   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

20   presented to the state courts. 28 U.S.C. §2254(d). Under the "contrary to" clause, a federal habeas court

21   may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court

22   on a question of law or if the state court decides a case differently than the Supreme Court has on a set of

23   materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). Under the

24   "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the

25   correct governing legal principle from this Court's decisions but unreasonably applies that principle to the

26   facts of the prisoner's case. *Id.*

27

28

1    A determination of a factual issue by a state court shall be presumed to be correct, and the

2    applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28

3    U.S.C. §2254(e)(1).

4                                           <u>DISCUSSION</u>

5    **A.  Claim One: Failure to Give Manslaughter Instruction**

6    Petitioner was charged with two counts of first degree murder.  He sought instructions on first and

7    second degree manslaughter, which he contended were lesser included offenses of first degree murder.  *See*

8    RP 2376.  The trial court declined to give the manslaughter instructions.  Petitioner contends that the

9    failure to instruct the jury on these lesser included offenses that were warranted by the evidence violated

10   his constitutional right to Due Process of Law.

11   In rejecting this claim on direct appeal, the Washington Court of Appeals concluded in relevant part

12   as follows:

13   RCW 9A.32.030 (first degree murder); RCW 9A.32.050 (second degree murder); RCW
     9A.32.060(1)(a) (first degree manslaughter); and RCW 9A.32.070(1) (second degree
14   manslaughter) all proscribe killing another person, but each crime describes a different level of
     intent.  A person commits first degree murder when he or she kills either with premeditation or
15   "[u]nder circumstances manifesting an extreme indifference to human life, he or she engages in
     conduct which create a grave risk of death to any person."  RCW 9A.32.030(1)(b).  A person
16   commits second degree murder when she or he intentionally (but without premeditation) causes the
     death of another.  RCW 9A.32.050.  First degree manslaughter occurs when a person "recklessly
17   causes the death of another person."  RCW 9A.32.060(1)(a).  *Footnote omitted.*  A person
     commits second degree manslaughter "when, with criminal negligence, he causes the death of
18   another person."  RCW 9A.32.070(1).  *Footnote omitted.*  All four crimes describe the same
     offense–homicide–with different levels of intent and thus different levels of culpability.  Therefore,
19   manslaughter in the first and second degree are lesser degrees of murder in the first or second
     degree.  But an instruction on a lesser degree of a crime may still be denied if the evidence does not
20   suggest that the defendant committed only the lesser crime.

21   Oloth also argues that manslaughter in the first and second degrees are lesser included
     offenses to murder in the first and second degree.  In order to receive an instruction on a lesser
22   included offense, the defendant must demonstrate the following: "First, each of the elements of the
     lesser offense must be a necessary element of the offense charged.  Second, the evidence in the case
23   must support an inference that the lesser crime was committed."  *State v. Berlin*, 133 Wn.2d 541,
     545-46, 947 P.2d 700 (1997) (citing *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382
24   (1978)).  Under this test, manslaughter in the first and second degrees satisfy the legal prong of
     *Workman* and are lesser included offenses of murder in the first or second degree.  *State v. Pettus*,
25   89 Wn.App. 688, 700, 951 p.2d 284, *review denied*, 136 Wn.2d 1010 (1998).  But the factual
     prong is not satisfied because the evidence in this case shows much more than merely reckless or
26   negligent conduct.

27   Oloth's arguments fail because the evidence does not support the contention that Oloth
     committed only manslaughter.  It is not sufficient that the jury might simply disbelieve the State's
28   evidence supporting the charged crime.  *State Hurchalla*, 75 Wn.App. 417, 423, 877 P.2d 1293
     (1994), *review granted*, 125 Wn.2d 1020 (1995).  Rather, the evidence must support an inference

that the defendant committed the lesser offense instead of the greater one. *State v. Bergeson*, 64 Wn.App. 366, 369, 824 P.2d 515 (1992).  The evidence in this case showed that the defendants followed the victims' car, waited by the side of the road for the victims' car to emerge from a cul-de-sac, and then resumed the pursuit.  Also, they pursued the victims at close range and illuminated the victims' car with their headlight high beams and fired multiple times.  There were four occupants in the victims' car.  The driver was killed by a rifle shot to the head; the passenger was killed by two gunshots to his back.  Firing a rifle into an occupied car is not reckless or negligent conduct; it is extreme indifference to human life or, at least an intentional killing if it results in the death of another.  Of the three defendants, only Souththanom testified at trial, and he testified that Oloth got the rifle and that Oloth was the shooter.  Oloth's statement formed the only evidence of Oloth's claim that he was not the shooter and this statement, even if believed, still shows conduct amounting to more than mere recklessness or negligence.  Oloth went to get a rifle, said "Let's to [sic] get 'em," and took part in a drive-by shooting.  The evidence does not support Oloth's contention that only manslaughter was committed and, therefore, the instructions were properly denied.

Dkt. 72, Exh. B, at 15-16.

The constitutional guarantee of due process of law ensures that no person accused of a crime shall be convicted absent proof beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 362, 364 (1970); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993).  The Supreme Court has dealt with due process challenges to jury instructions on lesser included offenses, in the context of capital cases.  In *Roberts v. Louisiana*, 428 U.S. 325, 334-335 (1976), the Supreme Court found unconstitutional a Louisiana statute that permitted the jury in a capital murder case to return a verdict of guilty of the noncapital crimes of second-degree murder and manslaughter, even if there was no evidence to support the lesser verdicts.  The Supreme Court concluded that such a statutory scheme invited the jurors to disregard their oaths and convict a defendant of a lesser offense when the evidence warranted a conviction of first-degree murder, inevitably leading to arbitrary results.  *Id.*  In *Roberts*, the Supreme Court thus set a minimum requirement, in capital cases, that a jury is permitted to consider a noncapital crime only if evidence supports conviction of the noncapital crime.

The other end of the spectrum involves capital cases in which a jury was not instructed on a lesser included offense.  In *Beck v. Alabama,* 447 U.S. 625, 627 (1980), the Supreme Court held that a sentence of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense, when an Alabama statute prohibited a trial judge from giving the jury the option of convicting a defendant of a lesser included non capital offense, and when the evidence would have supported such a verdict. In *Beck*, the Supreme Court expressly did not decide "whether the Due Process Clause would require the giving of such instructions in a non-capital case."  *Beck v. Alabama*, 447 U.S. at 638 n. 14.  Two years later, in

*Hopper v. Evans,* 456 U.S. 605, 611-612 (1982), a death penalty case, the Supreme Court determined that an Alabama statute requiring that a lesser included offense instruction should given in non-capital cases when there is any reasonable theory from the evidence that would support the lesser offense did not offend constitutional standards, "and no reason has been advanced why it should not be applied in capital cases." *Beck* and *Hopper* thus established a due process right to an instruction on a lesser included offense only where the failure to give such an instruction left the jury with an all-or-nothing choice in a *capital case* to find the defendant "not guilty" or "guilty of capital murder." *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). The Supreme Court has not established that a defendant is constitutionally entitled to an instruction on a lesser included offense in a non-capital case. *See Gonzales v. Terhune*, 2006 WL 83054 (recognizing that there is no clearly established federal law, as determined by the Supreme Court, that entitles a defendant in a non-capital case to an instruction on a lesser included offense); *Turner v. Marshall,* 63 F.3d 807, 819 (9th Cir.1995), *overruled on other grounds, Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (failure of a state trial court to instruct on lesser included offenses in a non-capital case is not settled law, and the claim is therefore barred by the nonretroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

The state court did not address this claim under federal constitutional law. This court has reviewed petitioner's federal constitutional claim, according to the standard set forth in 28 U.S.C. §2254(d). There is no clearly established federal constitutional law, as determined by the Supreme Court, that required the state court, in a non-capital case such as this, to instruct the jury on the lesser included offenses of first and second degree manslaughter. The ultimate decision of the state court did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. The claim does not warrant habeas relief.

### B. Claim Two: *Bruton* Error

Petitioner claims that he was denied his Sixth Amendment constitutional right to confrontation when the trial court admitted statements of Detective Wiemer to the effect that petitioner's co-defendant Nga Ngoeung had told the detective that petitioner had responded to egging of the house by stating: "Let's go get 'em". Because petitioner had no opportunity to cross examine Mr. Ngoeung, petitioner contends that he was denied his right of confrontation.

The Washington Court of Appeals set forth the facts relevant to this claim, as well as its basis for

1   rejecting the claim.  The recitation by the Court of Appeals is well supported by the record, which

2   addressed the claim as follows:

3           The objectionable testimony occurred during the defense's cross-examination of Detective
    Wiemer. When asked if he had any evidence that Oloth directed the path of the suspect vehicle on
4   the night of the shooting, the detective responded, "[j]ust other than the comment, 'Let's go get
    'em.'" And when asked if Oloth had explained in his statement why he went to get the rifle from
5   the house, the detective stated, "[h]e just made the statement that, 'Let's go get 'em.'" Defense
    counsel did not object initially to either of these statements. Instead, counsel waited until he was
6   finished with his cross-examination and then brought the matter to the attention of the court and
    made a motion for mistrial. The defense objected for three reasons: first, that the statement had
7   already been ruled excluded by the court; second, that the statement was misattributed to Oloth,
    when Nga's statement said "someone" said it; [Footnote 4: In fact, Nga's statement did attribute
8   the "Let's go get 'em" statement to Oloth, but had been changed to "someone" said it for jury
    trial.] and three, that the misattribution to Oloth implied an intent to shoot the victims, which
9   conflicted with Oloth's contention that he did not intend to use the rifle. The defense counsel did
    not request, nor want, a curative instruction. The court elected to reserve judgment on the motion
10  for mistrial; but to address the misattribution of the statement, the court permitted the State to
    conduct the following re-direct of the detective:

11
    Q       Isn't it true that in [Oloth's] statement, he never mentioned anyone saying "Let's go. Let's
12          go get 'em"?

13  A       Correct.

14  Q       Isn't it also true that in [Nga's] statement, he said, "Someone said, 'Let's go. Let's go get
            'em'"?
15
    A       Correct.
16
            After the State rested, the motion for mistrial was renewed and the court denied it. Oloth's
17  counsel then made a motion to strike the detective's testimony. The testimony was not stricken.

18          There was no abuse of discretion under these circumstances. First, the court cleared up the
    confusion about the detective's meaning by clarifying that Oloth had not admitted to these
19  statements and Nga's statement, as read to the jury, did not attribute them to Oloth. Furthermore,
    as the prosecution argues, the evidence is cumulative. Another witness, Souththanom, testified that
20  Oloth said, "I'm going to get them, I'm going to get 'em." This evidence came in without objection
    and is nearly identical to the objectionable testimony. And the testimony itself is not that damaging
21  to the defense's case–it does not necessarily indicate that Oloth was directing the group's actions
    any more than any other person and therefore the irregularity is not serious. Finally, Oloth's
22  attorney did not request a curative instruction, which might have corrected any problem that
    existed. Therefore, the trial court was within its discretion in denying Oloth's motion for mistrial.
23  [Footnote 5 omitted.]

24  Dkt. 72, Exh. B, at 6-8.

25          The Sixth Amendment guarantees a criminal defendant the right to confront all witnesses and

26  testimony adduced against the defendant at trial. A defendant's right to due process is violated when a

27  nontestifying co-defendant's confession that expressly incriminates the other defendant is admitted at a joint

28  trial. *Bruton v. United States*, 391 U.S. 123, 137 (1968).  However, only those statements that expressly

ORDER
Page - 8

implicate the defendant or are powerfully incriminating implicate the *Bruton* rule.  *United States v. Enriques-Estrada*, 999 F.2d 1355, 1359 (9th Cir. 1993) (quoting *Bruton, supra*). *See also Gray v. Maryland*, 118 S.Ct.1151 (1998)(*Bruton* rule extends to redacted confessions in which the name of the defendant is replaced with obvious indication of deletion, such as blank space, word "deleted," or similar symbol).  The *Bruton* prohibition does not apply when extra-judicial statements are redacted to eliminate reference to other co-defendants, are not facially incriminating, and where the jury is instructed to consider the extra-judicial statements only against the person making the statement.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  A statement that possesses inculpatory value when linked with other evidence at trial does not violate the *Bruton* rule. Id. at 208-09.  Even if evidence was erroneously admitted, the error must be sufficiently prejudicial to warrant habeas relief.  Once the petitioner demonstrates the existence of constitutional error, the court must determine whether the error had actual and substantial prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 637-39 (1993).

Petitioner first argues that admission of Mr. Ngoeung's out of court statement (through Detective Wiemer) "Let's go get 'em," which was redacted at trial to "someone" said "let's go get 'em" violated the Confrontation clause because petitioner was linked to the statement by other evidence.  The statement had been redacted to eliminate reference to petitioner.  Even though that statement may have been able to be linked to petitioner through other admissible evidence, such a linkage does not constitute a *Bruton* error.  At least there is no clearly established federal law, as determined by the Supreme Court, that identification through such a linkage violates a defendant's right to confrontation.

Petitioner also argues that Detective Wiemer's two "let's go get 'em" statements violated his right to confrontation.  The first time Detective Wiemer made the statement, it was in response to a very broad question posed by petitioner's counsel:

> Q    Now, with all of the statements that you have taken, do you have any evidence to indicate, be it from Wendy, from Art, from Candyman, Shamrock or my client, do you have any evidence to indicate that my client directed the path of the suspect vehicle on the night in question, in other words, "Take a left, take a right" or that he was driving the car; do you have any indication of that?
>
> A    Just other than the comment, "Let's go get 'em".

RP 1745.   The question was broad and did not facially identify petitioner as the person who made that statement.   Although a linkage could have been made to petitioner as the person who made the statement, such a linkage does not violate the *Bruton* rule.

The second time that Detective Wiemer made the statement, it was in response to petitioner's counsel, as follows:

> Q   Now, when defendant Insyxiengmay gave you the statement about his getting the gun from the house, did he tell you what caused him to get the gun from the house?
>
> A   He just made the statement that, "Let's go get 'em."

RP 1764.   The record shows that Detective Wiemer heard that statement from Mr. Ngoeung, not from petitioner.   However, petitioner was not asked by petitioner's counsel whether Mr. Ngoeung had told him that petitioner had said "let's go get 'em", nor did Detective Wiemer testify to that.   The question posed to Detective Wiemer was whether, when petitioner gave the detective the statement about his getting the gun from the house, petitioner had told the detective what caused him to get the gun from the house.   Detective Wiemer responded with a statement he attributed to petitioner that petitioner had in fact not given to the detective.   This was an error in Detective Wiemer's testimony; Detective Wiemer did not testify that Mr. Ngoeung had told him what petitioner had said–had he done so, it would have been a *Bruton* error.   The error in the testimony was later corrected on the record when Detective Wiemer testified that petitioner had never said to him "Let's go get 'em".   The error was further corrected when Detective Wiemer answered "Correct" when he testified that in Mr. Ngoeung's statement, Mr. Ngoeung had said "Someone said, 'Let's go.  Let's go get 'em'".   The record supports the conclusion of the Washington Court of Appeals that Detective Wiemer's testimony about petitioner's "Let's go get 'em" statement did not violate petitioner's right to confrontation.

The state court decisions rejecting petitioner's claim that hearsay evidence from a nontestifying co-defendant violated his Sixth Amendment right to confrontation were not contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.   This claim does not warrant habeas relief.

### C.  Claim Four: Exclusion from *In Camera* Hearing

Petitioner claims that his Fifth and Sixth Amendment rights were violated when he and his lawyer were excluded from a pretrial *in camera* hearing concerning the identity of a confidential informant, Kuong Prak.  The state appellate courts agreed that an error occurred, but the state courts determined that petitioner had not suffered prejudice since Mr. Prak did not possess exculpatory evidence material to the outcome of petitioner's trial.  This court denied relief on the claim.  The Ninth Circuit reversed that decision, concluding that the trial court's exclusion of petitioner and his lawyer violated the Confrontation Clause of the Sixth Amendment.  *Insyxiengmay v. Morgan*, 403 F.3d 657 (9th Cir. 2005).  The Ninth Circuit remanded the case to the district court to conduct an evidentiary hearing to determine whether petitioner was prejudiced by the constitutional error.  *Id.*

On January 5, 2006, this Court conducted an evidentiary hearing on the question of prejudice resulting from the Sixth Amendment constitutional violation.  During the evidentiary hearing, the court heard evidence and argument.  Evidence presented included the testimony of Kuong Prak, Bryan Hershman, and William Cassio; exhibits admitted; and the Record of Proceedings.  Citations to the Record of Proceedings will hereafter be RP, followed by the pages numbers.  Having heard and considered the evidence presented and the argument of counsel, the court now makes the following findings of fact and conclusions of law:

### Findings of Fact

Kuong Prak and Brian Hershman (petitioner's trial counsel) testified truthfully to the best of their recollections.  Because of the period of time that has elapsed since the offense, their memories were somewhat dimmed, however.  William Cassio's testimony was less credible; his memory is also dimmed by the passage of time and, in addition, he has a history of giving incorrect and evasive answers, as will be further discussed below.

The petitioner was convicted of two counts of murder in the first degree and two counts of assault in the first degree for an August 1994 attack on four individuals who had egged his gang's hangout.  Immediately following the egging, the petitioner and two other members of his gang, the Original Loco Boyz (OLB), secured a firearm and jumped into a car, followed the victims, and shot at them, resulting in two deaths and two assaults.  It appears undisputed that the car was driven by Nga Ngoeung, and that the

petitioner and Southanom Misaengsay were in the car.  The question of who fired the fatal shots is disputed.

The Confidential Informant (CI), Kuong Prak, was a member of the OLB and had knowledge of the gang and its organization and customs, and knowledge of the reputation of the petitioner and Misaengsay (that Misaengsay had a reputation for violence and that petitioner had a reputation as being comparatively peaceable.)  Prak had no personal knowledge of the events surrounding the offense.

At some time before the day of the offense, Mr. Prak had developed a relationship with Deputy Eugene Allen of the Pierce County Sheriff's Office, who was also a Thai boxing instructor.  Mr. Prak took instruction from Deputy Allen.  After the offense had occurred but before petitioner was arrested, Deputy William Cassio of the Pierce County Sheriff's Office was investigating the offense and wanted to talk with a gang member.  Deputy Allen became aware of Deputy Cassio's investigation and suggested that Deputy Cassio talk to Mr. Prak.  Deputy Cassio and Mr. Prak discussed the case, and Mr. Prak became a CI with instructions from Deputy Cassio that he get closer to petitioner, who was a suspect.  Later, Mr. Prak tipped Deputy Cassio off to the whereabouts of petitioner on September 1, 2004, which resulted in the arrest of petitioner.  Mr. Prak also tipped Deputy Cassio off to the whereabouts of Mr. Ngoeung on September 3, 2004, which resulted in Mr. Ngoeung's arrest.  During the time between the offense and his arrest, petitioner told Mr. Prak what had happened, and told Mr. Prak that he was not the shooter.  Mr. Prak's role as a CI was the subject of an *in camera* hearing before the trial judge.

During the time that Mr. Prak was acting as a confidential informant for Deputy Cassio, Deputy Cassio went to Mr. Prak's family's  home in Spanaway, Washington, and met some members of Mr. Prak's family.  Deputy Cassio was also aware that Mr. Prak intended to enter the Job Corps at White Swan, WA.  After the second arrest, Deputy Cassio and Mr. Prak had a discussion in which Deputy Cassio indicated that one of the suspects, Mr. Misaengsay, had confessed to being the shooter.

After the arrests, Deputy Cassio paid Mr. Prak $1,000.00.  The amount was determined by Deputy Cassio, to pay Mr. Prak for his CI services, and to assist him in leaving the gang and gang life by moving to his Job Corps site.  Mr. Prak left for the Job Corps in September 1994.  Deputy Cassio knew that Mr. Prak could be contacted through Deputy Allen, Mr. Prak's family, or the Job Corps.  In fact, Mr. Prak did stay in contact with Deputy Allen, at least through April of 1995.

Mr. Prak was fearful that if his name were connected to this investigation, gang members would injure or kill him, and Deputy Cassio had the same fear and felt that he should protect Mr. Prak as a confidential informant.  Deputy Cassio told Mr. Prak that he would see to Mr. Prak's protection.

Deputy Cassio corroborated much of Mr. Prak's testimony.  He agreed that he went to Mr. Prak's family home, or his grandparents' home; was introduced to members of Mr. Prak's family there; and had the address.  He agreed that he spoke to Mr. Prak after Mr. Ngoeung's arrest; that he paid Mr. Prak $1,000.00 for his services as a CI and to assist in his relocation.  Deputy Cassio was aware of Mr. Prak's plan to enter the Job Corps.  He believed that Mr. Prak was in danger, and also was unaware of any personal knowledge that Mr. Prak had regarding the offense.  He acknowledged that the Prak address on Mr. Cassio's report, Exhibit 2, was not the Spanaway address at which he had visited Mr. Prak's family.  He did not deny telling Mr. Prak that one of the suspects in the case confessed or that Mr. Misaengsay confessed to being the shooter, but he did indicate that he had no recall of saying those things.  He acknowledged that he did have information from Detective Weimar that there had been a confession, which did *not* include an admission that the petitioner was the shooter.

It is apparent from Exhibit 2 and the events of pretrial hearings and trial, that Deputy Cassio was attempting to protect his confidential informant, Mr. Prak, and was not wholly truthful because of concerns for Mr. Prak's safety.

At some point before trial, Mr. Hershman became aware that there was a CI and that it was one of the people listed on Deputy Cassio's report, Exhibit 2.  He and counsel for Mr. Ngoeung, Mr. Thoenig, used reasonable efforts to locate all of those individuals listed on Exhibit 2, and made appropriate motions to the court for disclosure of the CI and for the addresses and whereabouts of potential witnesses.  Defense counsel were unsuccessful and never learned, before trial, the identification of the CI, Mr. Prak.  Their efforts led to the *in camera* hearing, conducted by the trial judge, to determine whether the identification of the CI should be disclosed.  The only witness at that hearing was Deputy Cassio, and following the hearing, the trial judge ruled that because the CI had no personal knowledge of the offense events, the witness did not have to be disclosed to the defense and, further, to protect the CI, the trial court directed counsel not to advise petitioner of the existence of the CI.  Unfortunately, Deputy Cassio was not wholly truthful and was evasive in regard to the identification and whereabouts of the CI.  Deputy Cassio did not

mention a CI in his arrest report (Exhibit 2), and he repeatedly and falsely indicated that the police had located the criminal defendants by means of routine patrols rather than by information provided by a CI.

At the *in camera* hearing on March 30, 1995,  the following exchange took place between Prosecutor Ladenburg and witness Cassio:

Q     (By Mr. Ladenburg) Do you have any current address, phone number, or ability to reach this individual, this informant?

A     The address I have is listed on the general report.

Q     Other than the one that is on the report where he and others were taken into custody?

A     I don't.

Q     Likewise, do you have any addresses of any of the other individuals who were taken into custody in the car that the informant was taken in with, the informants car?

A     No, I don't.

RP at pp. 331-332.  Deputy Cassio's responses were, at best evasive, because he did have knowledge of how to reach Mr. Prak.

On March 30, 1995, in a colloquy with the court and the prosecutor during the Washington State Criminal Rule 3.5 hearing on the admissibility of statements, Mr. Hershman and Mr. Thoenig (counsel for Mr. Ngoeung), also requested information on the whereabouts of the CI and other witnesses.  The following colloquy occurred:

By Prosecutor Ladenburg:

We have provided them with all the discovery, and will continue – we are looking for a number of those individuals ourselves, for both this and other cases, and we will provide them every address and phone number, possible contact we have to locate any of those individuals, and they could call them to the stand if they feel they have some relevant evidence. . . . [RP  296]

. . . .

And I represent to the Court that we have given them every address of the individuals that are on that arrest sheet that we currently have, and that we will go back today and ask the police to recheck their records, and if we have any false addresses or phone numbers or indicia of how to contact these individuals, they will provide that to the defense as to anybody on that list, as to the question of how that arrest took place and the circumstance[s] surrounding the handling of his client.

At this point, there's speculation that someone has additional information of that. But nevertheless, going past that issue, they still have that.  They still have that available, and we are going to give them everything we have.  But they have not made a showing to why they need to know which one was the person who made the phone call, nor is there a

showing that they need to tell that to their clients in order to adequately represent these people before the Court.

And yet, I think there is still the presumption that my informant, in a situation like this, is under a threat, and that has not been overcome.

I think the Court should order that we continue to provide any relevant information as to addresses and information on those eight individuals and order that the defense counsel not release the information to their clients, that the informant was in fact one of the people arrested with them and made a phone call during that trip. Those two pieces of information would result in danger to the informant, to the belief of the State. [RP 302-04]

. . . .

We could not hold all those individuals in this case, and we took what information we could and we, as officers of the court, guarantee that we will provide to the defense counsel any information we have about any one of those individuals who was arrested with the defendants in this case, whether that be phone numbers, addresses, or methods to contact them.

And we are willing to put Detective Cassio on the stand, and you can ask him that in open court, if he has additional addresses. And if there are some we don't know about, we will provide them immediately to the defense. [RP  310]

The following occurred in further colloquy on April 3, 1995:

MR. THOENIG:  If I was not mistaken, we had one further matter.  I believe in terms of the witnesses that were present in the car, we were supposed to be afforded addresses.  I think the Court directed that, if I'm not mistaken.

THE COURT:  I don't recall directing that.

MR. LADENBURG:  I think we offered it.

MR. THOENIG: I have not received anything.

MR. LADENBURG:  We haven't yet either, counsel.  We asked the detectives last week to make a further search of criminal history records and arrest records for any of these individuals to see if they are in custody of the state elsewhere, and we believe those searches have either been done or are under way, and when we get the information, we'll pass it on to counsel.

THE COURT:  Will you please let the defense counsel know the status of that search before the end of today?

MR. LADENBURG:  Sure.

MR. THOENIG: I went over Detective Cassio's report, and I was able to contact a Somalay An, who it was my impression that the people that were listed were all present at the time of the arrest.  It's difficult to say for sure who was in the two cars.  It lists who was in the one car.  I talked to Mr. Ngoeung and he said he wasn't present in either car at the time of the arrest, so the State has continually argued – I don't have the benefit of knowing what went on in the closed hearing on Friday or really what the basis of the Court's ruling is in terms of the evidentiary matter, but they have argued that it doesn't have any value

1    because I have access to all of the people that were there that can give information .

2           From my point of view (1) I don't have access.  I don't have good addresses on the
     individuals, and (2) it seems some of the people I'm asking, or at least one, Somalay An,
3    says he wasn't there, but it appears he was there, but I would like a list of the individuals
     who were present in the two cars.  I can't determine that from Detective Cassio's report.

4
           THE COURT:  State's response to that request?
5
           MR. LADENBURG:  Suggest he ask Detective Cassio on the stand.  He's going to
6    testify, and he can ask him about his report and how they got those names on there.  I doubt
     if the deputy drew those names out of a hat.  Those names and addresses and identifying
7    information are on the report.  The detective's report stands as to what the State knows
     about the incident, and we believe the individuals listed were the individuals at the scene.
8    Certainly he can cross-examine the detective to ask further information about who may have
     been there or how those names got on the report.
9
           THE COURT:  Mr. Thoenig?
10
           MR. THOENIG: I have no response, Your Honor.
11
           THE COURT: All right.  You can obtain the information from Deputy Cassio.  I
12   understand he's the next witness in ths matter. . . .

13   RP 351-53.

14          On April 4, 1995, at the CrR 3.5 hearing, this further exchange took place between Mr. Hershman,

15   and Deputy Cassio:

16   Q     (Continuing by Mr. Hershman) You indicated on the record that you first had
           contact with my client or at least saw him in terms of surveillance on the day of his
17         arrest around the location where people were mourning the death of these two
           young men; is that right?
18
     A     I saw him on 168th Street East at about 6th Avenue East.
19
     Q     And that was as a result of routine surveillance?
20
     A     Yes.
21
     Q     Of all the places in Tacoma to look for him, why were you looking there?
22
     A     We had information called into the sheriff's department at the east substation 1 that
23         there was going to be a large gathering at the vigil in excess of 100 persons. They
           were going to shut the road down back and forth.  We were also getting calls at the
24         substation saying there was going to be a drive-by shooting at the vigil.  We stepped
           up uniform surveillance and stepped up uniforms inside the vigil area.  We
25         eventually blocked off the roads, which was the plan.  We also responded to the area
           to watch in case the suspects did happen to drive by.
26
     Q     There was no other source of information that led you to that scene apart from what
27         you had indicated on the record?

28   A     Not that area, no.

ORDER
Page - 16

1   RP 505-06.  Deputy Cassio's answers, again, were less than truthful.

2        Information on Mr. Prak's whereabouts was never provided to Mr. Hershman or Mr. Thoenig,

3   although the whereabouts of, and contact information for, Mr. Prak was available through Deputy Cassio

4   and Deputy Allen.

5        Because of Mr. Prak's concerns over his own safety, it is somewhat questionable as to whether he

6   would have freely talked with defense counsel Hershman if Mr. Hershman had been able to locate Prak.  It

7   is also questionable as to what Mr. Prak would have testified to had he been called at trial.  Nevertheless,

8   for purposes of this proceeding, this court should assume that Mr. Prak, had he been located by defense

9   counsel, would have testified truthfully to matters within his knowledge.

10        During his testimony at the evidentiary hearing, Mr. Hershman identified the following issues in the

11   case: (1) Who was the actual shooter: Mr. Misaengsay or petitioner?  (2) If Mr. Misaengsay was the

12   shooter, what was petitioner's intent during the offense?  (3) Mr. Misaengsay's credibility, particularly in

13   regard to his testimony that petitioner was the shooter.  (4) Gang structure, particularly as it might lend

14   credence to the proposition that Mr. Misaengsay was the shooter.   (5) The relative reputations for

15   violence of Mr. Misaengsay and petitioner.  (6) Whether petitioner made a prior consistent statement that

16   could be used to bolster his testimony or to encourage him to testify.  (7) Deputy Cassio's credibility.

17        The defense theories, as explained by Mr. Hershman, were as follows:

18        (1) If it could be established in trial that Mr. Misaengsay was the shooter rather than petitioner, it is

19   much more likely that the court would have instructed the jury on manslaughter, which requires lesser

20   intent than murder.  It follows that, as to petitioner, a verdict of either not guilty, or guilty to manslaughter

21   rather than murder, would have been much more likely.  Therefore, Mr. Misaengsay's credibility was much

22   at issue, and Mr. Prak's testimony that Deputy Cassio indicated that at some point Mr. Misaengsay

23   confessed to being the shooter, would have aided the defense investigation.  Such evidence would have

24   provided a lead-in to more investigation of whether there was such a confession; and it might have further

25   undermined Deputy Cassio's credibility at the CrR 3.5 hearing.

26        (2) If the defense had information that petitioner made prior statements consistent with him not

27   being the shooter, that would have aided Mr. Hershman in his arguments to his client urging him to testify,

28   and would have increased the likelihood that petitioner would have testified at trial.  In other words, the

1  prior consistent statement would have been available to bolster re-examination of petitioner, if, at trial, the

2  prosecutor had implied that petitioner was lying about not being the shooter.

3      (3) There was some testimony in the trial from a Mr. Davidson, who was familiar with the OLB

4  gang, but was not a member, about the gang structure.  While of doubtful admissibility, Mr. Prak, as an

5  insider, would have been more likely to have knowledge about the gang structure, including the conclusion

6  that it was more likely that M, as a more senior gang member, would be in the front (shooter's seat) of the

7  car and more likely that the more junior gang member, petitioner, would be in the back seat.

8      (4) While it is also questionable as to whether reputation testimony would have been admissible,

9  Mr. Prak's testimony, if admitted, would have been helpful in showing that Mr. Misaengsay was known to

10  be aggressive, violent, crazy and unpredictable, whereas petitioner had a reputation as being peaceable.

11                    **Legal Standard for Harmless Error Analysis**

12      Habeas petitioners  are not entitled to habeas relief based on trial error unless they can establish that

13  it resulted in actual prejudice.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Habeas relief may not be

14  granted if there is merely a reasonable possibility that trial error contributed to the verdict.  *Id.* To obtain

15  relief, the error must have had a substantial and injurious effect or influence in determining the jury's

16  verdict.  *Id.* at 638.

17      In unusual cases, a court may grant habeas relief where the record review leaves the conscientious

18  judge in grave doubt about the likely effect of an error on the jury's verdict. *O'Neal v. McAninch*, 513

19  U.S. 432, 435 (1995). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial

20  error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that

21  error is not harmless." *Id.* at 436. This exception applies "only in the remarkably unusual circumstance

22  where 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to

23  the harmlessness of the error.'" *Bonin v. Calderon*, 59 F.3d 815, 824 (9th Cir. 1995).

24      The Court must defer to the state court determination that an error did not cause prejudice unless

25  the state court decision on prejudice was contrary to or an unreasonable application of clearly established

26  federal law. 28 U.S.C. § 2254(d); *Inthavong v. Lamarque*, 420 F.3d 1055, 1058-59 (9th Cir. 2005). If the

27  Court determines that the state court decision was either an unreasonable application of or contrary to

28  Supreme Court precedent, the Court must still apply the *Brecht* harmless error analysis. *Inthavong*, 420

1  F.3d at 1059 (citing *Bains v. Cambra*, 204 F.3d 964, 976-77 (9th Cir.2000); *Picazo v. Alameida*, 366 F.3d

2  971, 971 (9th Cir.2004)). The Court may not grant habeas relief unless the petitioner suffered actual

3  prejudice from the constitutional error. *Inthavong*, 420 F.3d at 1059.

### Conclusions of Law

5       It is clear from the Ninth Circuit opinion that a Sixth Amendment violation occurred.  It is clear

6  from the testimony in this case that the violation was exacerbated by Deputy Cassio's evasive answers and

7  by failure of the prosecution to provide contact information for the confidential informant, Mr. Prak, which

8  was available from Deputy Cassio and Deputy Allen.  Did those violations prejudice the petitioner?

9       It appears clear to the court that the aforementioned violations clearly impeded the defense's

10 investigation.  It is highly speculative, however, as to whether a more complete investigation would have

11 resulted in a different verdict or would have turned up admissible evidence of assistance to petitioner.

12       *If* Mr. Prak, the CI, had been identified and located by the defense, and *if* he had been willing to

13 talk to the defense, *if* he appeared at trial and testified, and *if* his testimony had been admitted (which is

14 doubtful under the Rules of Evidence),  he might have testified as to the reputation of Mr. Misaengsay and

15 of petitioner, and the structure of the gang as it might relate to this particular offense.  Whether such

16 testimony would have been admitted and/or would have assisted the defense is highly speculative.

17       *If* the defense had been aware of Mr. Prak's recollection that Deputy Cassio referred to Mr.

18 Misaengsay as having admitted to being the shooter, investigation into what Mr. Prak would have told

19 defense counsel *may have* led to further testimony to that effect, but the record is not clear that there was,

20 in fact, any such statement by Mr. Misaengsay to the police. Any statement about what Deputy Cassio told

21 Mr. Prak would have been hearsay.  Moreover, any statement about what Mr. Misaengsay told Deputy

22 Cassio, as would possibly have been relayed to defense counsel by Mr. Prak, would have been double

23 hearsay.  Mr. Misaengsay did not testify at the evidentiary hearing; there is no direct–or

24 admissible–evidence in the record that Mr. Misaengsay admitted to being the shooter.  Whether's Mr.

25 Misaengsay's credibility could have been successfully attacked, based on Deputy Cassio's statement to Mr.

26 Prak regarding an admission by Mr. Misaengsay, is highly speculative.

27

28

1    Finally, whether petitioner's prior consistent statement regarding not being the shooter, made to

2    Mr. Prak, would have, in fact, caused petitioner to change his mind and testify at trial, is highly speculative.

3

4    Petitioner's arguments rest on an assumption that, had he possessed information about Mr. Prak, he

5    could have developed evidence that would have cast doubt on petitioner's role as the shooter.  Whether

6    petitioner was the shooter is not, however, the pivotal issue upon which his guilt was determined.

7    Petitioner got the rifle from the house; he got in the car with the rifle; shots were fired from that rifle and

8    from the car that resulted in the death of two people and the assault of two people; and, after the incident,

9    petitioner returned the rifle to the house and told another occupant to get rid of the rifle.  The jury could

10   have concluded that petitioner was guilty whether he was a principal or an accomplice.  Further, although

11   petitioner argues that he could have argued for a lesser degree of crime had he been able to cast doubt on

12   who the shooter was, the jury arguably had already taken that into account when petitioner was found

13   guilty of extreme indifference to human life, under RCW 9A.32.030(1)(b), rather than of acting with

14   premeditated intent, under RCW 9A.32.030(1)(a).  The Washington Court of Appeals concluded that "the

15   evidence in this case shows much more than merely reckless or negligent conduct."  Dkt. 44, Exh.2, at 15.

16   This court cannot say that this conclusion is contrary to or an unreasonably application of clearly

17   established law, as determined by the Supreme Court, nor was the decision based on an unreasonable

18   determination of the facts in light of the evidence presented to the state courts.

19   The result of the foregoing analysis is this court's conclusion that, although the defense

20   investigation was unconstitutionally impeded, petitioner has not shown that the error had a substantial and

21   injurious effect or influence in determining the jury's verdict.

22   The state court decisions concluding that the constitutional error did not prejudice petitioner were

23   not contrary to or an unreasonable application of clearly established federal law, as determined by the

24   Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the

25   facts in light of the evidence presented to the state courts.  This claim does not warrant habeas relief.

26   **D.  Claim Six:  Polygraph**

27   Petitioner claims that he was denied his Sixth Amendment right to confront Southanom

28   Misaengsay when the court refused to permit him to cross examine Mr. Misaengsay about the impact of a

polygraph examination and the changed terms of a plea agreement for the purposes of arguing that the state was so interested in Mr. Misaengsay identifying petitioner as the shooter that it did not care whether he was telling the truth.  In addition, petitioner argues that exclusion of this evidence prohibited him from establishing or arguing that the polygraph results put additional pressure on Mr. Misaengsay to identify petitioner because the failed polygraph provided the state with evidence that Mr. Misaengsay, not petitioner, was the shooter.

In rejecting this claim on direct appeal, the Washington Court of Appeals concluded as follows:

Oloth argues that he was denied his constitutional right to confront Southanom by the trial judge's decision to exclude the results of Southanom's polygraph examination. Southanom was a key witness in the State's case. He testified that Oloth was the shooter. Because Southanom, Oloth, and Nga had all initially claimed that a fourth person was the shooter, and Oloth argued at trial that Southanom was more likely to be the shooter than Oloth, Oloth argues that Southanom's credibility was crucial. Southanom allegedly failed his polygraph examination [Footnote 3:  We do not have the polygraph report in evidence.  The State read a part of this report to the trial court, however, and argued that Southanom did not fail the test, but rather that the results were "indefinite or inconclusive."  The defense stated that the report also said "indicative of deception."] but the trial judge refused to admit the test results absent a stipulation. Oloth attacks the exclusion of this evidence, arguing that it denied him his constitutional right to confront a witness against him. He urges that these results were relevant because Southanom's failure of the test cast suspicion on his story and the State's version of events. Although the evidence may have been relevant, the question is whether this relevancy required the trial judge to admit the test's results.

Admission of evidence is within the sound discretion of the trial court and will not be disturbed on review absent a showing of abuse of discretion. *State v. Stubsjoen*, 48 Wn. App. 139, 147, 738 P.2d 306, *review denied*, 108 Wn.2d 1033 (1987). "[P]olygraph examinations are inadmissible in this state absent stipulation." *State v. Rupe*, 101 Wn.2d 664, 690, 683, 683 P.2d 571 (1984) (citing *State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982); *State v. Young*, 89 Wn.2d 613, 574 P.2d 1171, *cert. denied*, 439 U.S. 870 (1978); *State v. Woo*, 84 Wn.2d 472, 527, 527 P.2d 271 P.2d 271 (1974)). In *Rupe*, our state Supreme Court held that a defendant's right to confront witnesses is not violated by suppressing evidence of a failed polygraph because the principle limitation on that right is that the evidence sought to be admitted must be deemed reliable. 101 Wn.2d at 690. "'In the exercise of this [Sixth Amendment] right, the accused ... must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Rupe*, 101 Wn.2d at 690 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Not only are polygraph examinations in general deemed unreliable, this particular test had additional indicators of unreliability because of language and cultural differences. (RP 2131) The trial court therefore did not abuse its discretion, nor did it violate Oloth's constitutional rights by excluding the polygraph test results.

Dkt. 72, Exh. B, at 4-5.

Criminal defendants have a Sixth Amendment right to confront witnesses testifying against them at trial.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  This right to confront witnesses serves three important purposes:  (1) to ensure reliability by requiring the witness to make statements under oath; (2) to submit the witness to cross-examination; and (3) to allow the jury to assess the witness' credibility.  *California v.*

*Green*, 399 U.S. 149, 158 (1970).  The right to confrontation promotes both the reliability of criminal

trials and the perception of fairness in the criminal justice system.  *Lee v. Illinois*, 476 U.S. 530, 540

(1986).

The right to confrontation is not absolute.  Trial judges retain wide latitude to impose reasonable

limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues,

the witness' safety, or interrogation that is repetitive or only marginally relevant.  *Delaware v. Van*

*Arsdall*, 475 U.S. 673, 679 (1986).  No error occurs unless cross-examination is restricted in an area of

critical importance and the denial of cross-examination was prejudicial.  *Id.*, at 681-84.  Any limitation on

the right to cross examination must be reasonable and may not be arbitrary or disproportionate to the

purposes the limitations are designed to serve.  *See Fowler v. Sacramento County Sheriff's Dep't*, 421

F.3d 1027 (9th Cir. 2005)(quoting *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986) and *Michigan v.*

*Lucas*, 500 U.S. 145, 151 (1991)).  The state court's decision to exclude certain evidence must be so

prejudicial as to jeopardize the defendant's due process rights.  *Tinsley v. Borg*, 895 F.2d 520, 530 (9th

Cir. 1990), *cert. denied*, 498 U.S. 1091 (1991).  States may exclude evidence which is unreliable,

confusing, misleading or unfairly prejudicial.  *Montana v. Egelhoff*, 518 U.S. 37, 41-42 (1996).

Souththanom Misaengsay signed a plea agreement with the state prior to trial.  RP 2110-2111.  The

plea agreement [final plea agreement] contained the following provision in Paragraph 5:

> In view of the respondent's complete cooperation, to include that he was not the shooter, that he was in the back seat and that he truthfully named Nga Ngoeung as the driver and Oloth Insyxiengmay as the shooter, the plaintiff, State of Washington, agrees to stipulate to the continued juvenile jurisdiction as above described before the respondent, Mr. Misaengsay.

RP 2111-2112.

A prior draft [first draft] of the plea agreement had included other language in Paragraph 5, which

was as follows:

> In view of the defendant's complete cooperation, *as corroborated by polygraph*, to include that he was not the shooter, that he was in the back seat, that he truthfully named Nga Ngoeung as the driver and Oloth Insyxiengmay as the shooter, and that he testifies truthfully when called as a witness, the plaintiff, State, agrees to stipulate to juvenile jurisdiction as above for Mr. Misaengsay.

RP 2127.  *Emphasis added*.

Between the first draft and the final plea agreement, Mr. Misaengsay was administered a polygraph. The court has been unable to locate either of the drafts of the plea agreement or the polygraph report in the record. It appears that Exhibits D 85 and D 86 are the first draft and final plea agreement at issue, and D87 appears to be a copy of the polygraph report. The court has reviewed the record, and it appears that, while the court does not have the original documents, the record is sufficiently clear for the court to rule on this claim.

The trial court ruled that evidence regarding the polygraph was not admissible, concluding as follows:

> There are too many extraneous issues to hear the conclusions of the polygrapher that there are a number of reasons that might indicate deception. Clearly if this no deception was indicated, it's not coming in under the purpose as requested by Mr. Hershman. All it shows is he perhaps didn't pass the polygraph. There is enough with regard to the plea agreement as what he's agreed to testify to, so you can cross-examine with regard to his motive and his intent and interest in maintaining his plea agreement.

RP 2145.

Petitioner maintains that cross examination regarding the failed polygraph was crucial to impeaching the most damaging witness in this case. The court recognizes that Mr. Misaengsay was an important witness in this case because he testified that petitioner got the rifle (RP 2098); petitioner said "Look at this white boy throwing eggs at us" (RP 2098); petitioner said "I'm going to get 'em" (RP 2101), that petitioner got into the car (RP2 098 - 2099), and that petitioner shot the rifle (RP 2102, 2104). Petitioner contends that, had he been able to elicit testimony about Mr. Misaengsay's deception in answering the polygraph questions, he could have shown and argued that Mr. Misaengsay had agreed to testify to what the prosecutor wanted, even though that was not the truth, because conforming to what the prosecutor wanted him to say was the only way he could be tried as a juvenile rather than an adult. RP 2128.

A review of the record shows that petitioner's counsel cross examined Mr. Misaengsay in detail about his plea agreement, and, in particular about his motive to testify as the prosecutor wanted.

Q    And you knew that when you signed this agreement, that pursuant to the understanding of the State of Washington, that your information would be that Oloth Insyxiengmay pulled the trigger; isn't that right?

A    Yes.

| | | |
|---|---|---|
| 1 | Q | And there was never any question about that, was there, that your testimony would be that Oloth Insyxiengmay pulled the trigger; isn't that right? |
| 2 | | |
| | A | Yes. |
| 3 | | |
| 4 | Q | And, further, it's your understanding that if you take the stand today and testify that, "No, somebody else pulled the trigger," or "I don't know who pulled the trigger," if you testify as to anything other than that Oloth Insyxiengmay pulled the trigger, you don't have a deal with the State, do you? |
| 5 | | |
| 6 | A | Nope. |
| 7 | Q | And that plea agreement expressly mentions, does it not, the word "decline," talks about a declination from juvenile court jurisdiction, doesn't it? |
| 8 | | |
| | A | Yes. |
| 9 | | |
| 10 | Q | And you understand a decline process to be whereby you are brought before the Court and the Court makes a determination if you'll be tried as an adult; you understand that, don't you? |
| 11 | | |
| 12 | A | Yes. |
| 13 | Q | And if you are declined, you don't get out when you're 21 if you get convicted, do you? |
| 14 | A | No. |
| 15 | Q | It's your understanding that you'll spend the rest of your natural life in prison? |
| 16 | A | Yes. |
| 17 | Q | And you knew that when you signed that agreement, didn't you? |
| 18 | A | Yes. |

RP 2161-2163.

Moreover, the evidence is not as probative as petitioner claims. The first draft was not signed; the polygraph was taken during the process of negotiating the plea, not after a plea agreement had been signed. *See* RP 1221 (polygraph was administered before the deal); RP 2140 (agreement not entered into until after polygraph was taken and both parties knew results were inconclusive); RP 2140 (final plea agreement, "the one that was signed by all parties", should go to the jury).

In addition, cross examination on the results of the polygraph would have inevitably led to introduction of collateral issues. While petitioner maintains that the polygraph examiner found Mr. Misaengsay to be deceptive in his answers, the prosecutor maintained that the results of the polygraph were inconclusive and that petitioner was not an appropriate candidate for a polygraph. Petitioner's

counsel (Mr. Hershman) and the prosecutor (Ms. Amos) made reference to the substance of polygraph

report in their arguments, as follows:

> MR. HERSHMAN....Now, let me tell you what happened here.  This initial draft was given to Mr. Winskill [Mr. Misaengsay's counsel] and to the witness.  After it was given to him, he took a polygraph, and if you would like me to read from the polygraph, where I can make it an exhibit, except this is the only copy I have, quote–this is quoting Van Victor [who administered the polygraph]–"There were emotional where disturbances indicative of deception in the subject's polygraph records on the following questions: (1) Did Tiny Snoopy shoot at the guys who were throwing eggs?  Answer: Yes."

RP 2127-2128.

> MS. AMOS....The results of the polygraph were not, as Mr. Hershman says, indicative of deception.  Rather, I would quote the last paragraph of the polygraph report by Mr. Victor: "It is my opinion, based on the results and the qualifications listed above, that the overall assessment of this examination is indefinite or inconclusive.
>
> He found basically that this young person was not a suitable subject for polygraph.  He listed behavioral concerns, language problems, cultural differences, age.

RP 2130-2131.

In order to appropriately cross examine Mr. Misaengsay on the effect the polygraph would have had on his plea agreement, and in order to conduct appropriate redirect, other foundational evidence regarding the polygraph would have been required, i.e. testimony of the polygraph administrator Mr. Van Victor.  Permitting petitioner to cross examine Mr. Misaengsay about the results of the polygraph would have introduced collateral issues into the proceedings and, without further development of the facts relating to the polygraph, would have been confusing.

Finally, petitioner maintains that the results of the polygraph themselves were not the key issue– that petitioner's motivation to lie was the issue.  However, the motivation to lie was dependent on petitioner's position that Mr. Misaengsay was deceptive in his answers to the polygraph. As a result, the validity and results of the polygraph would have to be established before petitioner could argue about their effect on Mr. Misaengsay's testimony.  Under state law, such polygraph evidence may be suppressed because it has not been determined to be reliable. *State v. Rupe*, 101 Wn.2d 664, 690 (1984). *See also Brown v. Darcy*, 783 F.2d 1389, 1396, n.13 (9th Cir. 1986)("The questionable reliability of polygraph evidence undermines its relevance, and the potential prejudice, time consumption and confusion caused by the introduction of polygraph evidence outweigh its probative value.*").

1    The state court decision to exclude reference to the polygraph test is supported by the record.

2    Petitioner was not denied his right to confrontation.  He was able to cross examine Mr. Misaengsay

3    extensively on the plea agreement and on his motivation to lie about petitioner's involvement in the crime.

4    Any relevance of the polygraph evidence was severely undermined by the confusion such evidence would

5    have introduced,  and the collateral issues and evidence that would have been required to pursue and

6    respond to the proposed evidence.  Finally, cross examination of Mr. Misaengsay would necessarily have

7    been based on a test that has not been determined to be reliable.

8    The state court decisions rejecting petitioner's claim that his right of confrontation was denied

9    when he was not permitted to use or reference the polygraph to cross examine Mr. Misaengsay were not

10   contrary to or an unreasonable application of clearly established federal law, as determined by the

11   Supreme Court, nor did they result in a decision that was based on an unreasonable determination of the

12   facts in light of the evidence presented to the state courts.  This claim does not warrant habeas relief.

13   **E.  Conclusion**

14   The court has carefully reviewed all of petitioner's claims, has conducted a thorough review of the

15   record, and has considered all of the evidence presented at the evidentiary hearing.  The state court

16   decisions rejecting petitioner's claims were not contrary to or an unreasonable application of clearly

17   established federal law, as determined by the Supreme Court, nor did they result in a decision that was

18   based on an unreasonable determination of the facts in light of the evidence presented to the state courts.

19   Petitioner's claims do not warrant habeas relief.

20   Therefore, it is hereby

21   **ORDERED** that the petition for writ of habeas corpus is **DENIED**.  This case is **DISMISSED**

22   **WITH PREJUDICE**.

23   The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any

24   party appearing *pro se* at said party's last known address.

25   DATED this 25th day of January, 2006.

26

27

28                                                Robert J. Bryan
                                                  United States District Judge

ORDER
Page - 26